# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **MJR INTERNATIONAL, INC.** : | |
| : | |
| **Plaintiff,** : | |
| : | Case No. 06-CV-0937 |
| v. : | |
| : | **JUDGE ALGENON L. MARBLEY** |
| **AMERICAN ARBITRATION** : | Magistrate Judge Terence Kemp |
| **ASSOCIATION, et al.,** : | |
| : | |
| **Defendants.** : | |

## OPINION & ORDER

## I. INTRODUCTION

This matter is before the Court on Plaintiff MJR International, Inc.'s ("MJR's") Motion for Summary Judgment (dkt. no. 42). MJR filed suit against Defendant the American Arbitration Association, Inc. ("AAA") and Defendant Victoria's Collection, Inc. ("VC") seeking: (1) to obtain a preliminary and permanent injunction to stay arbitration proceedings between VC and a third company pending this Court's determination of whether MJR is bound to participate in that arbitration; and (2) to obtain a declaratory judgment that MJR is not bound to participate in that arbitration

For the reasons set forth below, MJR's Motion for Summary Judgment is **DENIED**. Also VC's Motion for Leave to File a Surreply in Opposition to MJR's Motion for Summary Judgment (dkt. no. 46) is **GRANTED**. Finally, VC's Motion for Leave to File a Motion for Summary Judgment (dkt. no. 55), which was filed six months after the deadline for dispositive motions, is **DENIED**.

## II. BACKGROUND

### A. Factual Background

*The Parties*

This dispute centers around the contractual dealings of three companies, each of whom wanted to buy or sell Victoria's Secret Direct ("VSD") clothing on the secondary market. MJR has the exclusive right to sell "excess" VSD products, *i.e.* returned or discontinued items, on the secondary market. (Def.'s Opp'n Br. Ex. 2, MJR/Oxford Agreement). YK Investment Inc. ("YKI") is a South Korean Company that wanted to buy VSD clothing. YKI subsequently assigned its interest to VC. Thus, VC is used synonymously with YKI throughout this opinion and VC is a defendant in this case.

Oxford Investment Group, LLC ("Oxford") was to act as the middle man in the transaction between MJR and VC. Specifically, Oxford agreed to buy VSD clothing from MJR each month and resell it to VC. To this end, MJR and Oxford entered into two agreements. The first was the March 3, 2003, Korean Representation and Sales Agreement ("Korean Representation and Sales Agreement"), which states:

> MJR International Inc. (MJR) is the exclusive contractual holder with Victoria Secret Direct (VSD) . . . Oxford Investment Group LLC . . . is an entity that exclusively represents the interest of MJR with regard to sales of VSD product to South Korea through its partnership with YKI Inc. (YKI) a South Korean company that wishes to engage in the purchase of authorized VSD product.

The second was the June 17, 2003 Agreement between MJR and Oxford ("MJR/Oxford Agreement"), which states:

> Whereas, [Oxford] and MJR entered into an Agreement dated March 3, 2003, whereby [Oxford] has been given the exclusive right to represent the interests of MJR with respect to sales of VSD Products in South Korea and to contract with YK Investment Inc. ("YKI") for sales of VSD Products in South Korea; and [w]hereas, YKI desires to purchase Products from MJR through [Oxford] and [Oxford] desires to facilitate sales of Products with YKI, pursuant to the terms

and conditions, specified in this Agreement . . . [Oxford] and MJR hereby agree as follows.

Section 4.8 of that Agreement also contains a broad arbitration clause requiring that:

[a]ny controversy arising under, out of, or in connection with, or relating to, this Agreement and any amendment thereof, or breach thereof, including any disagreements as to the interpretation of any provision of this Agreement shall be determined and settled by arbitration in accordance with the rules of the American Arbitration Association.

The MJR/Oxford Agreement further specifies that it is to be governed by Ohio state law. (MJR/Oxford Agreement §4.5.)

*The Oxford/VC Agreement*

YKI was VC's predecessor in interest. YKI wanted to buy VSD clothing from MJR, through Oxford, and sell it in the South Korean market. Negotiations between YKI and Oxford took place in the summer of 2003.

Jeffrey Bradshaw ("Bradshaw"), MJR's president, stated in his deposition that during the negotiations, he provided Oxford with a 2002 letter from VSD that stated that MJR was VSD's exclusive vendor. Bradshaw's deposition testimony also confirms that he gave the letter to Oxford "for the purpose of [Oxford] letting YKI know that . . . MJR was the exclusive vendor for sell-off of Victoria's Secret Direct." (Def.'s Opp'n Br. Ex. 8, 46-47.) In a second letter dated July 1, 2003, addressed to both Oxford and VC, Bradshaw reiterated that MJR was the only vendor of VSD products to the South Korean market. (Id. Ex. 8, 46-47; Ex. 5.)

On July 3, 2003, less than one month after signing the MJR/Oxford Agreement with MJR, Oxford entered into an agreement with YKI ("VC/Oxford Agreement"). The VC/Oxford Agreement mirrored the terms of the MJR/Oxford Agreement. For example the VC/Oxford Agreement describes the purpose of the Agreement as follows:

> WHEREAS, MJR International Inc. ("MJR") has been given the exclusive right by Victoria Secret Direct ("VSD") . . . to sell new, original excess first quality VSD products ("VSD Products"), as evidenced by the letter annexed hereto as Exhibit A; and WHEREAS [Oxford] and MJR entered into an Agreement dated March 3, 2003, whereby [Oxford] has been given the exclusive right to represent the interests of MJR with respect to sales of VSD Products in South Korea and to contract with YKI for sales of VSD Products in South Korea; and WHEREAS, YKI desires to purchase VSD Products from MJR through [Oxford], and [Oxford]desires to facilitate sales of VSD Products with YKI . . .[Oxford] and YKI hereby agree as follows . . . .

Also like the MJR/Oxford Agreement, Section 5.8 of the VC/Oxford Agreement contains a broad arbitration clause requiring that:

> [a]ny controversy arising under, out of, in connection with, or relating to, this Agreement and/or the Guarantee Fee Agreement, and any amendment thereof, or breach thereof, including any disagreement as to the interpretation of any provision of this Agreement and/or the Guarantee Fee Agreement, shall be determined and settled by arbitration in accordance with the rules of the American Arbitration Association.

The VC/Oxford Agreement is to be governed by New York State law. (VC/Oxford Agreement, §5.5.) The 2002 VSD letter to MJR that Bradshaw provided to Oxford is attached to the VC/Oxford Agreement as Exhibit A. MJR did not sign the VC/Oxford Agreement.

Shortly after executing the VC/Oxford Agreement, YKI requested permission to assign its interest to VC. MJR and Oxford jointly granted permission for the assignment in a July 16, 2003 letter. It states:

> THIS LETTER IS TO CONFIRM OUR (MJR/[OXFORD]) AUTHORIZATION FOR YKI INC TO ASSIGN THE EXCLUSIVE RIGHTS FOR KOREAN MARKET OF VSD PRODUCTS TO THEIR NEW COMPANY "VICTORIA'S COLLECTION" (SAME CEO).

That letter is on MJR letterhead and was signed by both Bradshaw and Richard Peluso, Oxford's Director.

*The Underlying Arbitration*

VC claims (and documentary evidence supports) that, in accordance with the terms of the VC/Oxford Agreement, VC gave a $500,000.00 deposit to Oxford followed by approximately $233,000.00 for the first month's purchase of VSD products from MJR. MJR disputes whether this sale actually occurred. VC further claims that no VSD products were ever delivered to VC. As a result, VC instituted an arbitration proceeding against Oxford.[1]

VC originally named MJR as a party to the arbitration. MJR objected, claiming that MJR had no agency relationship with Oxford and consequently could not be bound by the VC/Oxford Agreement to arbitrate with VC. MJR was removed from the arbitration pending further evidence of an agency relationship. During discovery, VC became convinced that MJR was Oxford's principle and sought to rejoin MJR as a party to the arbitration. On June 5, 2006, the AAA arbitrator found that an agency relationship existed between MJR and Oxford and joined MJR as a party to the arbitration.

## B. Procedural History

After the arbitrator's decision to reinstate MJR as a party to the arbitration, MJR filed this suit in Ohio State Court seeking declaratory and injunctive relief. VC removed the case to federal court on the basis of diversity jurisdiction under 28 U.S.C. § 1332. On September 25, 2007, this Court granted MJR's motion to stay the arbitration pending this Court's determination of MJR's claim for declaratory relief, namely the determination of whether there is a valid

---

[1] The arbitrator summarized the events giving rise to the arbitration as follows:
> YKI had a contract with [Oxford] wherein YKI paid [Oxford] in excess of $500,000 to purchase Victoria Secret Direct excess products for re-sale in South Korea; [Oxford] in turn was to obtain the products from MJR. MJR later refused to provide the product, contending that YKI breached its contract with [Oxford] by misrepresenting and advertising the products and other wrongful conduct, and has retained YKI's Payment. YKI then commenced this arbitration.

(Def.'s Opp'n Br. Ex. 7, 6/6/2006, AAA Preliminary Order #7.)

agreement to arbitrate between MJR and VC. MJR has moved for summary judgment. VC opposes.

## III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [and] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## IV. LAW AND ANALYSIS

The only issue before the Court in this case is whether MJR can be bound to arbitrate based on an arbitration clause in a contract that it did not sign. As a threshold matter, it is the court's role to decide whether the parties agreed to arbitrate, unless the parties "clearly and unmistakably" committed the question of arbitrability to the arbitrator. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1996) (same). In cases like this one, involving disputes about whether a purported agent had the authority to bind a nonsignatory principle to a contract containing an

arbitration clause, federal courts have repeatedly held that the court, not the arbitrator, must decide whether there is an agreement to arbitrate. *Sphere Drake Ins. Ltd., v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001) (holding a court must determine whether agent had authority to bind principal to arbitrate); *see also Sandvik AB v. Advent Intern. Corp*, 220 F.3d 99, 101 (3d Cir. 2000) (same); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (8th Cir. 1991) (same). Moreover, the arbitration clause in the VC/Oxford Agreement, while broad, does not "unmistakably" commit the question of arbitrability to the arbitrator. Therefore, the fact that the arbitrator made a finding that MJR was Oxford's principal is not dispositive, as the arbitrator did not have the power to determine that issue.

### A. Principal-Agent Relationship

It is well established that "arbitration is a matter of contract," and, accordingly, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). Nevertheless, "a nonsignatory may be bound to an arbitration agreement under ordinary contract and agency principles." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003). A nonsignatory principal can be compelled to arbitrate under an agency theory if a signatory signed the arbitration agreement as the nonsignatory's agent. *Id.; Am. Bureau of Shipping v. Tencara Shipyard S.P.A*, 170 F.3d 349, 352 (2d Cir. 1999) (nonsignatory can be bound on agency theory). A principal is bound by contracts executed by an agent with actual or apparent authority. *Master Consol. Corp. v. BancOhio Nat'l Bank*, 575 N.E.2d 817, 820 (Ohio 1991); *UBS AG, Stamford Branch v. HealthSouth Corp.*, No. 07 Civ. 8490, 2008 WL 2337846, at *6 (S.D.N.Y. June 6, 2008); *see Greene v. Hellman*, 412 N.E.2d 1301, 1305-06 (N.Y. 1980); Restatement (Second) of

Agency § 140.² Thus, if Oxford had either actual authority or apparent authority at the time it entered into the VC/Oxford Agreement, MJR is bound to that Agreement and the arbitration clause within it.

MJR contends that it is entitled to summary judgment on its request for declaratory judgment because: (1) MJR did not sign and is not a party to the VC/Oxford agreement and, consequently, cannot be bound to any arbitration clause within that Agreement; and (2) there was no principal-agent relationship between Oxford and MJR and, thus, Oxford could not bind MJR to arbitrate with VC by signing the VC/Oxford Agreement. VC counters that although MJR did not sign an agreement to arbitrate with VC, MJR can be bound to the arbitration provision in the VC/Oxford Agreement because Oxford was MJR's agent. VC argues that MJR should be compelled to arbitrate because: (1) the VC/Oxford and MJR/Oxford Agreements, along with the other documents in this case, establish that there was an actual agency relationship between MJR and Oxford; and (2) even if there was not an actual agency relationship, Oxford had apparent authority because MJR created the appearance that Oxford was MJR's agent and VC relied on that apparent authority.

Viewing the evidence in the light most favorable to the nonmovant, as the Court must on summary judgment, there is ample evidence in the record that Oxford was MJR's agent and therefore could bind MJR to arbitrate with VC. First, VC has produced evidence that Oxford had

---

² Both the MJR/Oxford Agreement and the VC/Oxford Agreement contain choice-of-law provisions (respectively Ohio law and New York law). The parties have not addressed what law they believe applies to the determination of whether MJR agreed to arbitrate with VC and alternately cite Ohio and New York state law, Sixth Circuit law, and the Restatement (Second) of Agency in their summary judgment briefs. A court must apply "ordinary state-law principles governing the formation of contracts" when deciding whether the parties agreed to arbitrate. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *accord Fazio v. Lehman Bros., Inc*., 340 F.3d 386, 393-94 (6th Cir. 2003). At first blush, New York law appears to be the relevant law as the VC/Oxford Agreement, which VC argues binds MJR to arbitrate, is governed by New York law. Ohio law, however, is also implicated as the parties dispute whether the MJR/Oxford Agreement, which is governed by Ohio law, created a principal agent relationship between MJR and Oxford. As the principles of agency are substantially similar under New York and Ohio law, however, the Court need not resolve this issue.

actual authority to bind MJR based on the agreements between MJR and Oxford.  Second, VC has produced evidence that Oxford had apparent authority to bind MJR based on MJR's conduct during the negotiation of the VC/Oxford Agreement and its behavior after the execution of that Agreement.

*1.  Actual Authority Based on the Agreements Between MJR and Oxford*

Actual authority exists where the principal manifests to the agent that the agent has the authority to act on the principal's behalf.  *BancOhio*, 575 N.E.2d at 820 ("Express authority is that authority which is directly granted to . . . the agent . . . by the principal"); *HealthSouth Corp.*, 2008 WL 2337846, at *6 ("An agent possesses actual authority to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestation to him" (internal quotation marks omitted)); Restatement (Third) of Agency § 2.02 ("An agent has actual authority to take action designated or implied in the principal's manifestations to the agent").  The plain language of both the MRJ/Oxford Agreement and the Korean Representation and Sales Agreement is sufficient to establish that an agency relationship existed between MRJ and Oxford in which Oxford was authorized to represent MJR in the sales of VSD products on the South Korean Market generally and to VC specifically.  The March 3, 2003 Korean Representation and Sales Agreement states, "Oxford Investment Group LLC . . . is an entity that exclusively represents the interest of MJR with regard to sales of VSD product to South Korea."  The MRJ/Oxford Agreement states,

> [Oxford] and MJR entered into an Agreement dated March 3, 2003 [the Korean Representation and Sales Agreement], whereby [Oxford] has been given the exclusive right to represent the interests of MJR with respect to sales of VSD Products in South Korea and to contract with YK Investment Inc. ("YKI") for sales of VSD Products in South Korea; and [w]hereas, YKI desires to purchase Products from MJR through [Oxford].

-9-

The Court finds no ambiguity in the language of these contracts and interprets the plain language of the contracts by giving the words their ordinary meaning. *Shifrin v. Forest City Enters.*, 597 N.E.2d 499, 501 (Ohio 1992) ("Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument" (internal quotation marks omitted)); *Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.*, 807 N.E.2d 953, 957, 958 (Ohio Ct. App. 2004); *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006) (interpreting Ohio law).

By their plain language these contracts establish that Oxford was authorized to represent MJR's interests regarding VSD product sales in South Korea and that Oxford was authorized to contract with VC. Both contracts were executed before Oxford entered into the VC/Oxford Agreement. From this evidence alone, a reasonable fact finder could conclude that Oxford had actual authority to contract with VC on MJR's behalf, that Oxford did so when it signed the VC/Oxford Agreement (which references the pre-existing contractual relationship between Oxford and MJR)[3], and, consequently, that Oxford bound MJR to the arbitration clause in the VC/Oxford Agreement.

MJR seeks to negate the evidentiary import of the contracts between MJR and Oxford in two ways. First, MJR contends that the MJR/Oxford Agreement never took effect because it was subject to a condition precedent that a sale of VSD products occur before the agreements took effect. In support of this position, MJR recites the contractual provision quoted above stressing

---

[3] As described earlier the VC/Oxford Agreement states:
  WHEREAS, MJR International Inc. ("MJR") has been given the exclusive right by Victoria Secret Direct ("VSD") . . . to sell new, original excess first quality VSD products ("VSD Products"), as evidenced by the letter annexed hereto as Exhibit A; and WHEREAS **[Oxford] and MJR entered into an Agreement dated March 3, 2003, whereby [Oxford] has been given the exclusive right to represent the interests of MJR** with respect to sales of VSD Products in South Korea and to contract with YKI for sales of VSD Products in South Korea.
(Emphasis added).

-10-

that the Agreement states that Oxford was to represent MJR "with respect to *sales*" and concludes that a sale had to be *completed* before Oxford had the authority to represent MJR's interest with respect to those sales. VC denies that the Agreement contains a condition precedent.

The Court rejects the MJR's strained and illogical reading of the contractual language. *Matthews v. Morris Sons Co.*, 692 N.E.2d 1055, 1058 (Ohio App. Ct. 1997) (Contract is ambiguous "if the rights and duties it imposes on the parties are *reasonably* subject to conflicting interpretations" (emphasis added)). A court may not interpret "what has no need of interpretation." *Allen v. Standard Oil Co.*, 443 N.E.2d 497, 499 (Ohio 1982) (internal quotation marks omitted) ("When a [writing] is worded in clear and precise terms; when its meaning is evident and tends to no absurd conclusion, there can be no reason for refusing to admit the meaning which [it] naturally presents" (internal quotation marks omitted, punctuation in quoting source)). Furthermore, a contract does not become ambiguous merely because "its operation may work a hardship upon one of the parties." *Aultman Hosp. Ass'n v. Commty Mut. Ins. Co.*, 544 N.E.2d 920, 924 (Ohio 1989). Examining the contract as a whole, the plain meaning of the language "with respect to sales" extends to pre-sale negotiations as well as post-sale transactions. The MJR/Oxford Agreement contains no limitation on Oxford's role that suggests the existence of a condition precedent.[4] Had the parties wished to prevent the Agreement from becoming effective until a sale of VSD products had been consummated then they could have simply included language to that effect.

Second, MJR contends that it made Oxford aware that there was no agency relationship between MJR and Oxford and thus Oxford had no actual authority to bind MJR. In support of

---

[4] Moreover, even if there were such a condition precedent, VC has produced evidence in the form of the deposition testimony of VC's 30(b)(6) witness, deposit slips, and purchase orders that support its contention that a sale occurred. (Def.'s Surreply, Exs. 1-2.)

this claim, MJR points to the deposition testimony of Jeffrey Bradshaw in which Bradshaw stated that "I don't recognize Oxford as an agent of MJR International, Inc.," and that he "clearly made Oxford aware of the fact there was no agency relationship . . . numerous times." (Pf.'s Reply. Br., Ex. B. Bradshaw Dep. 21, 43.) These statements, however, merely create a question of fact regarding whether the grant of actual authority to Oxford in the MJR/Oxford Agreement and Korean Representation and Sales Agreement was terminated by MJR. Given the somewhat vague foundation of Bradshaw's statements and the apparent lack of any documentary support this remains, at best, a credibility question for the fact finder. Moreover, self-serving, conclusory assertions in deposition testimony, without record support, are insufficient to support or oppose a motion for summary judgment. *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) ("Unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."). Finally, even if Oxford had no actual authority to bind MJR based on MJR's statements to Oxford, VC has produced evidence from which a reasonable fact finder could conclude that Oxford had apparent authority to bind MJR to the VC/Oxford Agreement.

2. *Apparent Authority Based on MJR's Conduct*

Apparent authority exists where the principal gives the appearance to a third party that the agent has authority to conduct a transaction and the third party believed that the agent had such authority and relied on it. *BancOhio*, 575 N.E.2d at 822; *Hellman*, 412 N.E.2d at 1306; Restatement (Third) of Agency § 2.03 ("Apparent authority is the power held by an agent . . . when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.") VC has produced several items of evidence supporting its claim that Oxford had apparent authority to bind MJR.

During the negotiation of the VC/Oxford Agreement, MJR's President, Bradshaw, provided Oxford with a 2002 letter from VSD stating that MRJ was the exclusive vendor of VSD Products. Bradshaw admitted at his deposition that he gave the letter to Oxford so that Oxford could give the letter to VC and prove to VC that MJR had the exclusive right to sell VSD products in South Korea. This letter was attached to the VC/Oxford Agreement as an exhibit. The fact that the VC/Oxford Agreement specifically references the relationship between MJR and Oxford, and attaches the 2002 VSD Letter as an exhibit to that Agreement supports VC's claim that Oxford had apparent authority because it suggests that VC relied on MJRs representations and believed that Oxford was MJR's representative. Arguably, the fact that MJR provided Oxford with the 2002 VSD letter alone would not be enough to establish apparent authority as the contents of that letter do not specifically state that Oxford is MJR's agent. However, in context, the fact that MJR was relaying information to VC through Oxford supports VC's claim that it reasonably believed that Oxford was MJR's agent.

Furthermore, VC has also shown that on that July 1, 2003 MJR sent a letter, addressed to both Oxford and VC, in which Bradshaw reiterated that MJR was the only vendor of VSD products to the South Korean market. This letter further supports VC's contention that it had reason to believe that it was dealing with Oxford as an agent of MJR, who was to be the ultimate supplier of the VSD Products VC wished to purchase.

Also, MJR's behavior after the execution of the VC/Oxford Agreement further supports VC's claim of apparent authority. Section 5.16 of the VC/Oxford Agreement deals with assignments and states, "[n]o party shall assign this agreement . . . without the prior written consent of the other party." Shortly after the execution of that Agreement, YKI sought to assign its rights to VC. Although MJR was not a signatory to the VC/Oxford Agreement and now

argues that it was not a party to the Agreement, MJR and Oxford jointly granted permission for YKI to assign its rights to VC. On July 16, 2003, MJR sent a letter stating:

> THIS LETTER IS TO CONFIRM OUR (MJR/[OXFORD]) AUTHORIZATION FOR YKI INC TO ASSIGN THE EXCLUSIVE RIGHTS FOR KOREAN MARKET OF VSD PRODUCTS TO THEIR NEW COMPANY "VICTORIA'S COLLECTION" (SAME CEO).

That letter is on MJR letterhead and was signed by both Bradshaw and Richard Peluso, Oxford's Director. The fact that MJR participated in granting YKI the right to assign its interests under the VC/Oxford Agreement bolster's VC's claim that Oxford had at least apparent authority to bind MJR to the Agreement. If there had been no agency relationship, there would have been no reason for MJR to be involved in granting the assignment.

Finally, although Bradshaw generally denies that that MJR ever publically held out Oxford as MRJ's agent, he admitted at his deposition that: (1) he was not aware of any communication from MJR to VC explaining that Oxford was not MJR's agent; (2) he was not aware of any documents given by MJR to VC explaining that there was no agency relationship between MJR and Oxford; and (3) that he did not know of any documents available to VC as of June, 2003 that indicated that MJR and Oxford did not have an agency relationship. (Def.'s Opp. Br. Ex. 4, Bradshaw Dep. 29, 30, 69-60.) Given all of the evidence discussed above, a reasonable fact finder could conclude that Oxford had apparent authority to bind MJR to the VC/Oxford Agreement. Therefore, MJR's Motion for Summary Judgment is **DENIED**.

### B. VC's Requests for Leave to File

VC has requested leave of the court to file (1) an untimely cross motion for summary judgment and (2) a surreply to MJR's Motion for Summary Judgment. The deadline for dispositive motions in this case was March 31, 2008. VC did not request leave to file a late motion for summary judgment until September 25, 2008, nearly six months after the deadline.

-14-

The only explanation VC gives for its need to file a tardy motion is that it was unable to take Bradshaw's deposition, MJR's Rule 30(b)(6) witness, until March 28, 2008 and therefore was unable to complete its own motion for summary judgment before the March 31, 2008 deadline. By its own account, however, VC was aware of its inability to meet the dispositive motions deadline two days before the deadline and, nevertheless, waited six months before requesting leave to file a late motion. Therefore, VC's Motion for Leave to File a Summary Judgment Motion is denied as untimely.

VC has also requested leave to file a surreply to MJR's Motion for Summary Judgment. VC explains that a surreply is necessary to address MJR's assertion, raised for the first time in its Reply, that no sale of VSD products occurred between the parties. MJR opposes VC's request. The Court finds that VC has demonstrated good cause for filing an additional memorandum as required by S.D. Ohio Civ. R. 7.2(a). Therefore, the Court grants VC leave to file its Surreply and has considered the arguments and exhibits contained therein in ruling on MJR's Motion for Summary Judgment.

## V.  CONCLUSION

For the foregoing reasons: (1) MJR's Motion for Summary Judgment (dkt. no. 42) is **DENIED**; (2) VC's Motion for Leave to File a Surreply in Opposition to MJR's Motion for Summary Judgment (dkt. no. 46) is **GRANTED**; and (3) VC's Motion for Leave to File a Motion for Summary Judgment (dkt. no. 55) is **DENIED**.

**IT IS SO ORDERED.**

    **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**United States District Court Judge**

**DATE: February 2, 2009**